**TRUSTEES OF THE BRICKLAYERS AND ALLIED CRAFTWORKERS, Local 5 New York Retirement, Welfare, Apprenticeship Training and Journeyman Upgrading and Labor–Management Coalition Funds; and Bricklayers and Allied Craftworkers, Local 5 New York, Plaintiffs,**

v.

**CHARLES T. DRISCOLL MASONRY RESTORATION COMPANY, INC. and Stephen Driscoll, individually, Defendants.**

No. 00 CIV. 2458(CM).

United States District Court,
S.D. New York.

June 5, 2001.

Stephen E. Ehlers, Gellert & Cutler, P.C., Poughkeepsie, NY, for Plaintiffs.

Paul Limmiatis, Bond, Schoeneck & King, LLP, Syracuse, NY, for Defendants.

**MEMORANDUM DECISION AND ORDER DENYING PLAINTIFFS' AND GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

MCMAHON, District Judge.

Plaintiffs Trustees of the Bricklayers and Allied Craftworkers ("Trustees"), Local 5 New York Retirement, Welfare, Apprenticeship Training and Journeymen Upgrading and Labor–Management Coalition Funds ("the Funds"), and Bricklayers and Allied Craftworkers, Local 5 New York ("Local 5") sue defendants Charles T. Driscoll Masonry Restoration Company, Inc. ("the Company") and Stephen Driscoll, under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 ("ERISA"), and § 301 of the Labor Management Relations Act, 29 U.S.C. § 185 ("LMRA"), to recover contributions owed to the Funds, for injunctive relief compelling defendants' compliance with a collective bargaining agreement, and for an audit of defendants' books and records. Plaintiffs move to amend their Complaint and for summary judgment on the ERISA claim. Defendants move to strike portions of the certification of Andrew Gallante, and cross-move for summary judgment.

For the reasons stated below, plaintiffs' motions for leave to file a second amended complaint and for summary judgment are denied. Defendants' motion to strike is granted in part, and defendants' motion for summary judgment is granted.

## FACTUAL BACKGROUND

Charles T. Driscoll Masonry Company, Inc. is a New York corporation engaged in the business of providing sealants, waterproofing, and masonry restoration in the construction industry. Since 1988, the Company has operated as a predominantly

non-union shop. Bricklayers and Allied Carpenters ("BAC") Local 2, based in Albany, is the affiliated Bricklayers local union where the Company is headquartered. Local 2's territory covers a large geographical area including the areas in and around Syracuse, Albany, Utica, Watertown, and Ogdensburg. Since the late 1980s, the Company has consistently refused to sign labor agreements with Local 2.

In the 1980s and 1990s, the Company performed various union jobs pursuant to individual project labor agreements—with, for example, BAC Local 8 and Local 11— each covering a single job. Because of the sporadic union work, some of the Company's employees maintained membership in Local 11 and Local 8, and attempted to maintain their eligibility for health and pension benefits from those Locals' fringe benefit funds.

In 1999, the Company submitted a bid to perform the sealant and caulking subcontracting work on a project in Fishkill, New York, involving the construction of an Old Navy Distribution Center. The general contractor on the project was Clayco Construction Company ("Clayco"). Fishkill is located in Dutchess County, within the seven-county territorial jurisdiction of BAC Local 5. Local 5's territorial jurisdiction also includes Orange, Putnam, Rockland, Sullivan, Ulster and Westchester Counties. The Company had never before been party to an agreement with Local 5 or its predecessors, and none of the Company's employees were members of Local 5. The Company's initial bid was based on the expectation that the work would be non-union.

In August 1999, Clayco informed the Company that it was considering using union labor on the Old Navy job, and asked the Company to submit another bid incorporating union labor costs. The Company complied, submitting a new bid, which was accepted by Clayco.

After being awarded the Old Navy work, the Company was provided the standard Local 5 labor agreement. Stephen Driscoll, the Company's vice president and sole shareholder, reviewed the agreement and, apparently intending to convert the standard agreement into a project agreement covering the single job, made extensive handwritten deletions and revisions. The Local 5 "traveling contractors clause" was among the many standard provisions Driscoll crossed out. According to Driscoll, he gave no thought to the traveling contractor clause because, by its very terms, it would not apply to a project agreement covering a specific, single job. On September 14, 1999, Driscoll signed the revised agreement and mailed it to Local 5. The Company ordered materials, and began performing preliminary work on the Old Navy project before an agreement was finalized with Local 5.

Local 5 rejected the marked up agreement, and sent Driscoll another standard agreement. On September 16, 1999, Local 5 Field Representative Tony Piacente called the Company's office and left a message stating: "[Y]ou are not allowed to cross out anything on [the] contract with Local 5—if you don't send back [the] agreement without crossouts your men will not be allowed on site." (Driscoll Aff. ¶ 10.) When Driscoll later spoke with Piacente by telephone, Piacente stated that the Old Navy project was a "union job," that "Local 5 does not sign project agreements," and that Driscoll would have to sign the standard Local 5 agreement without any marks—"or else." (*Id.*) By this time, the Company had already started work on the project using two of its regular employees from upstate New York— Jody Hollen and Dave Martin. Hollen was a member of Local 12 in Corning, and

Martin was a member of Local 11 in Rochester.

Driscoll signed the original standard Local 5 Agreement ("the Agreement") on September 24, 1999, and sent it back to Local 5 without making any changes. Local 5 President Andrew Gallante then signed the Agreement on behalf of the union. No negotiation or bargaining occurred between Driscoll and Local 5 over any of the terms set forth in the Agreement.

The Agreement contained a traveling contractors clause, which provides in its entirety:

> When the employer has any work specified in ARTICLE IV of this Agreement to be performed outside of the area covered by this Agreement and within the area covered by an Agreement with another affiliate of the International Union of Bricklayers and Allied Craftworkers, the employer agrees to abide by the full terms and conditions of the Agreement in effect in the jobsite area. Employees covered by this Agreement shall be paid at least the established minimum wage scale specified in ARTICLE I but in no case less than the established minimum wage scale of the local Agreement covering the territory in which such work is being performed plus all contributions specified in the jobsite local Agreement. The employer shall in all other matters be governed by the provisions established in the jobsite local Agreement. *If employees are sent to work on a project in an area where there is no local Agreement covering the work specified in ARTICLE IV of this Agreement, the full terms and conditions of this Agreement shall apply.*

(Def.Ex. E.7.9(d) at 25.) (emphasis added). Article IV refers to masonry work, and Article I sets forth a wage scale within Local 5's territorial jurisdiction.

In accordance with the terms of the Agreement, Driscoll requested that the Union supply six masons for the Old Navy job. The Union sent one worker whom Driscoll dismissed because he was too slow, and another worker whom Driscoll dismissed for failing a drug test. Driscoll hired two more of his regular employees from upstate New York—Scott Nemier and Keith Revette—to do the work. Both men were members of Local 11 in Rochester. In December 1999, Local 5 demanded that the Company keep one Local 5 member on the payroll. Local 5 sent Ernest Carillo, whom Driscoll employed. The next month, Carillo walked off the job and never returned. No other Local 5 members were employed on the Old Navy Job.

The vast majority of work on the Old Navy job was done by the four regular Company employees sent down from Upstate New York—Jody Hollen, Dave Martin, Scott Neimer and Keith Revette. Each of them signed Local 5 forms directing their benefit contributions on the Old Navy job to be reciprocated to their home local funds.

In or around October 1999, Local 2 president Albert Catalano called Local 5 president Andrew Gallante to inquire about the Local 5 traveling contractors clause, and its possible application to work performed by the Company within Local 2's territorial jurisdiction. Catalano discussed trying to use the Local 5 traveling contractors clause to induce Driscoll to sign a labor agreement with Local 2. In November 1999, Driscoll received from Catalano the agreement between Local 2 and the building construction industry employer associations for Central New York, Northern New York, and the Mohawk Valley, along with the Local 2 wage and benefit rates covering the Syracuse area. The accompanying letter stated: "In accordance to

[sic] the Collective Bargaining Agreement you signed in Local # 5 jurisdiction [sic] your employees should receive the Local # 5 wages and benefits until such time as the Local # 2 agreement is signed." (Driscoll Aff. at Ex. C.) Driscoll refused to sign the Local 2 Association Agreement—which covered the areas in and around Utica, Syracuse, Oswego, Watertown, and Ogdensburg.

Driscoll received a letter from Local 5 Field Representative Tony Piacente dated January 13, 2000. The letter claimed that fringe benefit fund contributions were owed by the Company for their work on the Syracuse Metropolitan Sewage Treatment Plant, a job in Local 2's territorial jurisdiction. The letter stated:

> It has come to our attention that Al Catalano from BAC Local 2 N.Y. has requested certified payroll for the project. He also asked that you sign their Collective Bargaining Agreement. If you do sign his Agreement then all fringes are due to his local for the above mentioned project. If you do not, then all fringes are due BAC Local 5 New York.

> If this matter is not settled by January 17, 2000 we will have to turn this matter over to our lawyer.

(Driscoll Aff. at Ex. E.)

On March 24, 2000, the Local 5 Funds, through their attorney Stephen Ehlers, sent the Company's attorney a letter demanding payment of fringe benefit contributions allegedly owed the Local 5 Funds for work performed within the territorial jurisdiction of Local 2. The letter claimed that because the Company had not signed a labor agreement with Local 2, the Bricklayers local exercising territorial jurisdiction over the job, "[t]he bargaining agreement which Driscoll signed with Local 5 is effective beyond the territorial jurisdiction

of Local 5 under these circumstances." (Limmiatis Aff. at Ex. CC.)

In the Spring of 2000, the employees working on the Old Navy job—Holen, Martin, Nemier, and Revette—began complaining to Driscoll that they were not receiving full credit for the benefits they had earned for work on the Old Navy job, because the Local 5 Funds were not fully reciprocating the benefit contributions back to the benefit funds of their home local unions. Nemier requested copies of various plan documents of the employee benefit plans comprising the Local 5 funds. In a letter dated April 25, 2000, BAC lawyers informed Nemier:

> The funds records do not indicate that you are a participant in any of the Local 5 fringe benefit funds because as you have authorized that [sic] all contributions made on your behalf be reciprocated back to your home local, BAC Local # 11 in Rochester. This being the case it does not appear that you have any interest, legal or otherwise, in the documents requested.

(Driscoll Aff. at Ex. F.)

In May 2000, Nemier filed a petition with the National Labor Relations Board ("NLRB") to decertify Local 5 as the bargaining representative of the Company's employees for the entire State of New York. On July 6, 2000, the NLRB dismissed the petition on the grounds that the application was too broad. The decision was based on the fact that Nemier had petitioned for a unit which included employees, not just in the seven counties covered by Local 5, but all employees of New York State.

On July 17, 2000, Revette filed a petition to decertify Local 5 as the bargaining representative of Company employees, limiting the bargaining unit to Local 5's seven county territorial jurisdiction. By Stipulated Election Agreement, a decertification

election was held on August 24, 2000. The bargaining unit members eligible to vote were limited to the four regular Company employees—Hollen, Martin, Nemier, and Revette—who worked on the Old Navy job. The four employees voted unanimously to decertify Local 5, and the Agreement was repudiated and voided, effective September 1, 2000.

Over the time period relevant to this action, September 24, 1999 to September 1, 2000, the Company worked on over 100 jobs in New York State. Only one of those jobs—the Old Navy job—was performed within Local 5's territorial jurisdiction. The other jobs were performed within the territorial jurisdiction of one of three Bricklayers locals—Local 2, Local 8, or Local 11. The Company did not have an agreement in effect with any of these other locals during the relevant period. The Company employed over 60 individuals who performed masonry work during that time.

Plaintiffs claim that benefit contributions are owed to Local 5 on all Company employees for work performed outside Local 5's territorial jurisdiction for the period of September 24, 1999 (the date the Agreement was signed) to September 1, 2000 (the date the Agreement was repudiated and voided), pursuant to the traveling contractor clause in the Agreement. (The First and Third Causes of Action).[1] Defendants argue that the company has no contractual obligation to pay benefit contributions to Local 5 Funds for work that was performed by the Company outside Local 5's jurisdiction, by employees who never were represented by Local 5 under the Agreement.

For the reasons stated below, defendants' motion for summary judgment is granted, and plaintiffs' motion for summary judgment is denied.

## DISCUSSION

Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine issue for trial exists if, based on the record as a whole, a reasonable jury could find in favor of the non-movant. *See Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. 2505. In making

---

**1.** Plaintiffs have voluntarily withdrawn their Second, Fourth, Fifth, and Sixth Causes of Action. They also seek to eliminate the Local 5 New York Retirement, Welfare, Apprenticeship Training and Journeymen Upgrading and Labor–Management Coalition Fund and Local 5 as plaintiffs, as well as Stephen Driscoll individually as a defendant.

The original Complaint alleged that the Company failed to make its contractually required contributions to the Funds for the period September 24, 1999 to September 1, 2000 under ERISA (First Cause of Action); that Driscoll should be held individually liable under ERISA—as an employer—for the Company's debts, because he undercapitalized the corporate defendant, mixed corporate and personal assets, and engaged in improprieties which left the Company with insufficient assets to pay the contributions owed the funds

(Second Cause of Action); that the Company was obligated to make and file employment reports, to pay wages to its employees, and to make contributions to the Funds under LMRA (Third Cause of Action); that Driscoll should be held individually liable under LMRA (Fourth Cause of Action); that the Company used funds deducted from its employees' salaries to pay creditors of the Company, rather than remitting such plan assets to the Funds in violation of ERISA (Fifth Cause of Action); that the Company is liable for federal common law conversion (Sixth Cause of Action); and that plaintiffs are entitled to an audit of the Company's books and records (Seventh Cause of Action), and injunctive relief to compel the Company to make timely contributions to the Funds for the duration of the Agreement (Eighth Cause of Action).

its determination, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *See id.* at 255, 106 S.Ct. 2505. To defeat summary judgment, the non-moving party must go beyond the pleadings and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). When opposing a motion for summary judgment, it is not sufficient for the non-moving party to present evidence that is conclusory or speculative, with no basis in fact. *See Liberty Lobby,* 477 U.S. at 249–50, 106 S.Ct. 2505.

1. *ERISA § 515 and Contract Construction*

Section 515 of ERISA, 29 U.S.C. § 1145 states that

Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

■ Congress added § 515 to ERISA in 1980 to "simplify actions to collect delinquent contributions, avoid costly litigation, and enhance the actuarial planning necessary to the administration of multiemployer pension plans." *Central States, S.E. & S.W. Areas Pension Fund v. Independent Fruit & Produce Co.,* 919 F.2d 1343, 1348 (8th Cir.1990); see generally *Central Pa. Teamsters Pension Fund v. McCormick Dray Line, Inc.,* 85 F.3d 1098, 1102–03 (3d Cir.1996); *Central States, S.E. & S.W. Areas Pension Fund v. Gerber Truck Serv., Inc.,* 870 F.2d 1148, 1151–54 (7th Cir.1989) (en banc). Section 515 creates a federal right of action independent of the contract on which the duty to contribute is based. *Bakery & Confectionery Union & Indus. Int'l Pension Fund v. Ralph's Grocery Co.,* 118 F.3d 1018, 1021 (4th Cir.1997) (citing *Bituminous Coal Operators' Ass'n, Inc. v. Connors,* 867 F.2d 625, 633 (D.C.Cir. 1989)).

■ Section 515 places employee benefit plans in a position superior to the original promisee, analogous to a holder in due course, by limiting the defenses available to an employer when sued by an employee benefit plan. *Benson v. Brower's Moving & Storage, Inc.,* 907 F.2d 310, 314 (2d Cir.1990). In *Benson,* the Second Circuit found that only two employer defenses are available: (1) that the pension contributions themselves are illegal; and (2) that the collective bargaining agreement is void (not merely voidable). The Court distinguished between fraud in the execution (which renders a contract void) and fraud in the inducement (which renders a contract merely voidable and which may not be raised as a defense in this type of action). According to plaintiffs, defendants' defenses of contractual ambiguity are insufficient because it does not fall within either category which were deemed acceptable in *Benson.*

The Second Circuit clarified its holding in *Benson* in *DeVito v. Hempstead China Shop, Inc.,* 38 F.3d 651 (2d Cir.1994). In *DeVito,* as a result of an ambiguity in the Agreement, the parties disputed an employer's obligation to pay benefits to a union health fund. Unlike *Benson,* where the parties knowingly signed an agreement that obligated defendant to contribute to an employee benefit plan, in *DeVito,* there was an underlying question about the validity of the Agreement itself. The Second Circuit reversed the district court's grant of summary judgment to the plaintiff (which had relied on *Benson* ), saying that

ERISA § 515 requires contributions only in accordance with the terms and conditions of the Agreement. "Although a variety of contract defenses would not preclude [plaintiffs] from enforcing their right to collect payments pursuant to the collective bargaining agreement, [they] are not entitled to enforce a nonexistent contractual obligation." *Id.* (quoting *Teamsters Inds. Employees Welfare Fund v. Rolls–Royce Motor Cars, Inc.*, 989 F.2d 132, 138 (3d Cir.1993)); *see also Aeronautical Indus. Dist. Lodge 91 v. United Technologies Corp.*, 230 F.3d 569, 576 (2d Cir.2000) (explaining that courts construing labor agreements should apply traditional rules of contract interpretation to the extent consistent with federal labor policies); *Carpenters Fringe Benefit Funds of Illinois v. McKenzie Engineering*, 217 F.3d 578, 582 (8th Cir.2000) ("Under ERISA § 515, the Funds may collect only those contributions that [the employer] is contractually obligated to pay") (citing *DeVito*, 38 F.3d at 653).

Accordingly, for plaintiffs to prevail on their claim for summary judgment under Section 515—and to survive defendant's cross-motion—they must show that the Agreement creates an unambiguous contractual obligation on the defendants to make contributions pursuant to the contended provisions. This they have not done.

■ The primary objective of a court in interpreting a contract is to give effect to the intent of the parties as revealed by the language of their agreement. *See Compagnie Financiere De Cic Et De L'UNION Europeenne, Management Invest. Funding Ltd v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 157–58 (2d Cir.2000). Summary judgment is only proper in a contract dispute if the language of the contract is wholly unambiguous. *See id.* (citing *Mellon Bank v. United Bank Corp.*, 31 F.3d 113, 115 (2d Cir.1994)). The question of whether the language of a contract is clear or ambiguous is a question of law to be decided by the court. *See id.* Contract language is ambiguous if it is "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." *Id.* (quoting *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1094 (2d Cir.1993)). While interpretation of ambiguous contract language generally is a question of fact to be resolved by the factfinder, *see id.*, "the court may resolve ambiguity in contractual language as a matter of law if the evidence presented about the parties' intended meaning [is] so one-sided that no reasonable person could decide to the contrary." *Id.* (quoting *3Com Corp. v. Banco do Brasil, S.A.*, 171 F.3d 739, 746–47 (2d Cir. 1999)).

### 2. Driscoll Does Not Owe Contributions to the Local 5 Funds Under the Traveling Contractors Clause

In order to construe the meaning of the traveling contractors clause, this Court will examine each of the arguably relevant sentences (the first and fourth) in turn.

The first sentence applies to work outside Local 5's territory which is covered by a jobsite local agreement; and the fourth sentence applies to work outside Local 5's territory which is not covered by a jobsite local agreement. If the first sentence applies, the jobsite local agreement governs the employer's benefit obligations; if the fourth sentence applies, the Local 5 Agreement governs the employer's benefit obligations.

#### a. Sentence One

■ The first sentence of the traveling contractors clause does not obligate the

Company to make contributions where it had no agreement with any other BAC affiliate.

The first sentence of the clause provides that "When the employer has any work specified in ARTICLE IV of this Agreement to be performed outside of the area covered by this Agreement and *within the area covered by an Agreement with another affiliate* of the International Union of Bricklayers and Allied Craftworkers, the employer agrees to abide by the full terms and conditions of the *Agreement in effect in the jobsite area.*" (Def.Ex. E.7.9(d) at 25.) (emphasis added) This language is unambiguous. It says that if Driscoll (the employer) does work as specified in Article IV (masonry) in an area of the state outside of Local 5's jurisdiction where Driscoll has an agreement with another BAC local (the other local), then Driscoll pays benefits in accordance with its agreement with the other local.

It is undisputed that the Company had masonry work outside of the area covered by the Agreement. During the period in question, the Company worked on over 100 jobs in New York State, and only one of them (the Old Navy job) was performed within Local 5's jurisdiction. If Driscoll had an agreement with another BAC local in any of those jurisdictions, that agreement would control the provision of benefits to all masons (including Local 5 masons) who were working any job in that area. But it did not. The record clearly shows that Driscoll did not have an Agreement with any local affiliate other than Local 5. In particular, it repeatedly refused to sign an agreement with Local 2. And plaintiffs have offered no other evidence of potentially applicable agreements.[2] Therefore, on its face, the language of Sentence One has no application to the facts at bar.

■ Not only is the language clear on its face, but plaintiff so testified. According to Local 5 President Andrew Gallante, who signed the Agreement on behalf of Local 5, the expression "Agreement in effect in the jobsite area" meant an agreement between the jobsite local and Driscoll Masonry.[3] (Gallante Dep. at 23–24.) Gal-

---

**2.** Plaintiffs have instead cited cases from other circuits where traveling contractors clauses have been considered and applied. *See, e.g., McKinstry Co. v. Sheet Metal Workers' Int'l Ass'n,* 859 F.2d 1382 (9th Cir.1988) and *Local Union No. 36 v. Atlas Air Conditioning Co.,* 926 F.2d 770 (8th Cir.1991). The contracts in those cases contained language different from that at issue in the case at bar, and have no bearing in the present contract interpretation. In the one (unpublished) case that reviewed an identical BAC agreement, *Trustees of the Colorado Tile, Marble & Terrazzo Workers Pension Fund v. Wilkinson & Co., Inc.,* 134 F.3d 383, 1998 WL 43172 (10th Cir. Feb 3, 1998), the parties did not challenge the enforceability of the traveling contractors clause.

**3.** In Gallante's deposition, the following exchange can be found:

> Q.  So if we're talking about Local 2, the phrase in the first sentence of the clause, agreement in effect in the jobsite area, what agreement would that be referring to, any specific agreement?
>
> A.  Yes. It would be the Local 2 collective bargaining agreement with the employer, which would be in that case Driscoll.
>
> Q.  What if Driscoll does not have an agreement or it did not have an agreement with Local 2?
>
> A.  Well, then [traveling contractors clause] would drop down to the following sentences.
>
> Q.  You mean the fourth sentence?
>
> A.  No. If—who are we talking about? What employees now are we—are you talking about Local 5 employees or Local 2 employees?  Are you talking about employees that Driscoll brought from Local 5 or just that -
>
> Q.  I'm just speaking generally.
>
> A.  Well, if—all right.  Generally, if Driscoll is working in Local 2 and he didn't have a contract, he would just be working there nonunion.

lante acknowledged in his deposition testimony that if the Company did not contract with Local 2, then the plaintiffs would have to rely on other sentences of the clause to enforce the Agreement against Driscoll for work performed outside Local 5's area.[4] Plaintiffs are bound by that admission.

As no one argues that sentences two and three are relevant here,[5] we turn to sentence four.

### b. *Sentence Four*

On its face, Sentence Four clearly binds only company employees who are sent from Local 5's jurisdiction to work on projects in other areas. There is no ambiguity in this language, and it does not support plaintiffs' theory of relief, either.

Sentence four of the traveling contractors clause provides: "If employees are *sent to work* in an area *where there is no local Agreement* covering the work specified in ARTICLE IV of this Agreement, the full terms and conditions of this Agreement shall apply." (Agreement, ¶ 7.9) (emphasis added). Plaintiffs contend that

this language binds Driscoll to pay benefits to Local 5 whenever Driscoll employees work on a project anywhere else in New York where Driscoll does not have an agreement with a BAC local. According to defendants, the only reasonable interpretation of the fourth sentence is that it applies only when employees performing masonry work within Local 5's territorial jurisdiction are subsequently "sent to work on a project" outside Local 5's territorial jurisdiction.

Defendants are correct. Again, the contract language is clear on its face. And again, extrinsic evidence confirms the parties' intent. Andrew Gallante, who signed the Agreement on behalf of Local 5, said that sentence four applies when "[Local] 5 masons are sent outside the Local 5 area." (Driscoll Aff. (Gallante Dep.) at 22.) Again, plaintiffs are bound by their admissions, in the face of which no reasonable trier of fact could interpret the contract except as proposed by defendants.[6]

---

> Q. And is it your contention that under these circumstances the Local 5 agreement would apply to work performed in Local 2's jurisdiction?
> A. If he—yes. If he—yes.
> (Gallante Dep. at 23–24.)

4. Gallante's affirmation to the contrary is stricken, it being the law of this Circuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment. *See Mack v. United States*, 814 F.2d 120, 124 (2d Cir.1987).

5. Sentences two and three provide that: "Employees covered by this Agreement shall be paid at least the established minimum wage scale specified in ARTICLE 1 but in no case less than the established minimum wage scale of the local Agreement covering the territory in which such work is being performed plus all contributions specified in the jobsite local Agreement. The employer shall in all other matters be governed by the provisions

established in the jobsite local Agreement." The parties agree that an employee who is covered by both the Local 5 agreement and a "jobsite local Agreement" would receive the higher wage scale of the two agreements—and that the "jobsite local Agreement" would cover all other terms and conditions of employment. There is therefore no dispute over the meaning of these two sentences.

6. While I find the contract language to be unambiguous on its face, I have alluded to testimony given by Local 5's President, Andrew Gallante. Mr. Gallante submitted a "certification" in support of the instant motion that contradicts his deposition testimony (which was highly favorable to defendants). Gallante's deposition testimony is, of course, extrinsic evidence of his view of events, and this has no bearing on an unambiguous contract such as the one at issue. Nevertheless, defendants move to strike portions of the certification by Andrew Gallante that contradicted his earlier deposition testimony.

According to defendants, the only employees who could possibly have been "sent to work" elsewhere in New York during the one year period when Driscoll's agreement with Local 5 was in force were those seven employees who were covered by the Local 5 Agreement on the Old Navy job. Plaintiffs have not offered any evidence that any of those seven individuals worked for the Company at a job site elsewhere in New York during the life of the Local 5 contract. In fact, it appears that three of them never worked for the Company again. The other four were all regular Driscoll employees who came into Local 5's jurisdiction only to work the Old Navy job and were members of other Bricklayers locals. It therefore cannot be that Local 5 "sent" them into other union jurisdictions. Moreover, plaintiffs have not demonstrated that any other Local 5 member was engaged by Driscoll and sent into an area where there was no contract between Driscoll and the local.

Having reviewed the language of the Agreement, I conclude that the clause applies only to masons who are represented by Local 5 and who were sent to work for Driscoll outside Local 5's territorial jurisdiction during the relevant period. Because there is no evidence that Driscoll sent any Local 5 mason elsewhere in the state between September 24, 1999 and September 1, 2000, defendants are entitled to summary judgment dismissing plaintiffs' remaining claims for relief.[7]

### 3. Motion to Amend the Complaint

■■■ Plaintiffs request leave to file a Second Amended Complaint. The Consent Scheduling Order provided that there would be no amendments to the pleadings permitted after August 15, 2000. This motion was filed on March 2, 2001, seven months after the period prescribed in the Consent Scheduling Order.

Plaintiffs seek to correct "an apparent problem of standing" (Pl. Mot. in Reply to Def. Mot. in Opp. to Amend. Compl.) that was to be raised as an affirmative defense by defendants.[8] The Complaint and Amended Complaint were filed on behalf

---

To the extent that Gallante's deposition testimony was contradicted by his later certification, the certification is stricken, and the Court has disregarded it in considering this motion. *See Mack v. United States*, 814 F.2d 120, 124 (2d Cir.1987) ("It is well settled in this circuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment"); *Raskin v. The Wyatt Company*, 125 F.3d 55, 63 (2d Cir.1997) ("[W]e follow the rule that a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony").

In particular, Gallante contended that the Local 2 agreement applies, through the first sentence of the Local 5 traveling contractors clause, to employees who were never covered by the Local 5 agreement. (Gallante Cert. ¶¶ 11, 13.) This contradicts his deposition testimony in which he said that the phrase "Agreement in effect in the jobsite area" referred specifically to an agreement between Driscoll and the local union. (Gallante Dep. at 23–24.) Paragraph 11 and the fifth sentence of paragraph 13 of Gallante's Certification directly contradict his deposition testimony, and are stricken from the record. Defendants also seek to strike the first sentence of paragraph 8—but this statement does not directly contradict the earlier testimony, as it describes only the "essence" of the agreement. Defendants' remaining motions to strike are denied, as they neither contradict earlier testimony, nor are they based on speculation by Gallante.

7. The remaining claims are the First, Third, Seventh and Eighth Claims for relief. They are dismissed in their entirety.

8. In *McKinstry, Atlas Air* and *Wilkinson*, the traveling contractors clause was enforced not by the funds of the signatory local (like Local 5), but by the funds of the local in whose territorial jurisdiction the work in question was being performed (like Local 2). Accordingly, the jobsite local funds, not the signatory

of the Local 5 Funds, to collect contributions to the Local 5 Funds alone. Neither the Complaint nor the Amended Complaint mentions contributions allegedly due the Local 2 Funds, Local 8 Funds, or Local 11 Funds. Presumably to remedy this problem, on February, 23, 2001, plaintiffs executed an "assignment" of Local 2's interests to Local 5. No such assignment of interest was procured from Local 8 or Local 11.

Having construed the contract as I have, it is clear that the addition of claims on behalf of the Local 2 Funds would not change the result on these summary judgment motions. Furthermore, allowing plaintiffs to expand their action to include claims on behalf of the Local 2 Funds would unfairly prejudice defendants by requiring the preparation of an entirely new factual defense without the benefit of necessary discovery. *See Krumme v. West-Point Stevens, Inc.,* 143 F.3d 71, 87–88 (2d Cir.) (Where proposed amendments would require additional discovery and further delay resolution of the action, prejudice sufficient to deny motion to amend was established), *cert. denied.,* 525 U.S. 1041, 119 S.Ct. 592, 142 L.Ed.2d 534 (1998); *Ansam Assoc. v. Cola Petroleum, Ltd.,* 760 F.2d 442 (2d Cir.1985) ("[P]ermitting the proposed amendment would [be] especially prejudicial given the fact that discovery had already been completed and [defendant] had already filed a motion for summary judgment").

Plaintiffs' motion is therefore denied.

4. Voluntary Dismissal

Plaintiffs seek to voluntarily dismiss the Funds and Local 5 as plaintiffs, as well as Stephen Driscoll individually as a defendant. Plaintiffs have not, however, filed a stipulation of dismissal pursuant to Fed.

R.Civ.P. 41(a). Because this Court has granted defendants' motion for summary judgment, the voluntary dismissal of parties is moot. This action is dismissed against all defendants.

CONCLUSION

For the foregoing reasons, plaintiffs' motion to file an amended Complaint is denied, defendants' motion to strike is granted in part. Defendants' motion for summary judgment is granted, and plaintiffs' motion for summary judgment is denied.

The case is dismissed against all defendants. This constitutes the decision and order of the Court.

---

local funds, had standing to enforce the agreement as applied to work outside the signatory local's territorial jurisdiction. De-

fendants intend to-raise standing as an affirmative defense.